UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SARAH A. SORG,

                Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                Defendant.

CASE NO.    C09-5063KLS

ORDER REMANDING THE
COMMISSIONER'S DECISION
TO DENY BENEFITS FOR
FURTHER ADMINISTRATIVE
PROCEEDINGS

      Plaintiff, Sarah A. Sorg, has brought this matter for judicial review of the denial of her application

for supplemental security income ("SSI") benefits.  The parties have consented to have this matter be

heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil

Procedure 73 and Local Rule MJR 13.  After reviewing the parties' briefs and the remaining record, the

Court hereby finds and ORDERS as follows:

<u>FACTUAL AND PROCEDURAL HISTORY</u>

      Plaintiff currently is 29 years old.[1]  Tr. 40.  She has an eleventh grade education and no past

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

relevant work. Tr. 26, 186.

On February 23, 2004, plaintiff filed an application for SSI benefits,[2] alleging disability as of January 1, 1988, due to chronic back pain and a bipolar disorder. Tr. 45, 180, 189, 852-55. Her application was denied initially and on reconsideration. Tr. 40-41, 60, 66. A hearing was held before an administrative law judge ("ALJ") on July 11, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 862-922. Also at the hearing, plaintiff amended her alleged onset date of disability to November 24, 1998. Tr. 19, 865. On September 26, 2006, the ALJ issued a decision determining plaintiff to be not disabled, finding specifically that she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 45-54.

On August 27, 2007, the Appeals Council granted plaintiff's request for review, remanding the matter to the same ALJ, and directing her to obtain additional evidence concerning plaintiff's mental impairments, further evaluate the medical and lay witness evidence in the record, give further consideration to plaintiff's residual functional capacity, and determine whether the testimony of a vocational expert is needed. Tr. 94-97. On remand, the ALJ conducted another hearing on January 17, 2008, at which plaintiff, represented by counsel, appeared and testified, as did a different vocational expert. Tr. 923-75. At that hearing plaintiff once more amended her alleged onset date of disability to July 31, 2002. Tr. 19, 925.

On July 23, 2008, the ALJ issued a decision, again determining plaintiff to be not disabled, finding specifically in relevant part:

>  (1)   at step one of the sequential disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity since February 23, 2004, the date she filed her application for SSI benefits;
>
>  (2)   at step two, plaintiff had "severe" impairments consisting of headaches, a bipolar disorder and a history of drug and alcohol addiction;
>
>  (3)   at step three, none of plaintiff's impairments met or medically equaled the

---

[2]Also on February 23, 2004, plaintiff filed an application for Child's Insurance Benefits. Tr. 45, 107-08. That application, however, apparently is not part of plaintiff's request for judicial review.

[3]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)    after step three but before step four, plaintiff had the residual functional capacity to perform light exertional work, with certain additional non-exertional limitations;

(5)    at step four, plaintiff had no past relevant work; and

(6)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 19-27. Plaintiff's request for review was denied by the Appeals Council on December 10, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 416.1481.

On February 4, 2009, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on April 24, 2009. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded for an award of benefits for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in not finding plaintiff's personality disorder to be a severe impairment;

(c)    the ALJ erred in assessing plaintiff's credibility;

(d)    the ALJ erred in evaluating the lay witness evidence in the record; and

(e)    the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

Defendant agrees that the ALJ erred in evaluating the medical evidence in the record and in determining plaintiff could perform other work at step five of the sequential disability evaluation process, but argues that an outright award of benefits is inappropriate at this time, asserting that remand to the Commissioner for further administrative proceedings is more proper.[4] The Court agrees. Thus, for the reasons set forth below, the Court hereby finds the ALJ's decision should be reversed, and this matter should be remanded for further administrative proceedings.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

---

[4]Defendant filed a motion to remand rather than a response brief. (Dkt. #15). The Court, though, finds it more proper to treat defendant's motion as such a response, and therefore hereby DENIES that motion on this basis. However, because defendant's motion is being treated as a response brief, the Court has considered the arguments contained therein on their merits.

1   Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole

2   to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

3   such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

4   v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

5   a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

6   1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

7   one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749

8   F.2d 577, 579 (9th Cir. 1984).

9   I.      The ALJ's Evaluation of the Medical Evidence in the Record

10          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

11   medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

12   the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

13   of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

14   must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th

15   Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

16   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

17   "falls within this responsibility."  Id. at 603.

18          In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

19   supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

20   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

21   thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the

22   evidence."  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

23   from the ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

24          The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

25   either a treating or examining physician.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

26   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

27   and legitimate reasons that are supported by substantial evidence in the record."  Id. at 830-31.  However,

28   the ALJ "need not discuss *all* evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler,

739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only

explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who

do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of

a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the

opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion

may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id.

at 830-31; Tonapetyan, 242 F.3d at 1149.

A.    Dr. Reuther

In mid-April 2004, plaintiff underwent a psychological evaluation conducted by James Reuther,

M.D. Tr. 298. Based on that evaluation, Dr. Reuther diagnosed plaintiff with a bipolar disorder and

methamphetamine abuse in early full remission, and assessed her with a global assessment of functioning

("GAF") score "equal to 60."[5] Tr. 298. In terms of plaintiff's prognosis and ability to function, Dr.

Reuther opined as follows:

> . . . The claimant is currently in treatment for her bipolar disorder and reports that her
> moods are doing a lot better. It is unclear exactly what the plan is as far as returning
> her on to her lithium and Depakote after the pregnancy, as far as what time this will
> occur. She is currently approaching a very difficult period as her illness may
> experience a severe exacerbation following the birth of her child. This is a time when
> she is at risk for major decompensation from her illness. It is likely that with
> resumption with mood stabilizer treatment she will continue to be stable within the next
> year.
>
> . . . She is currently managing her own funds and will likely be able to do so in the
> future. Some supervision will likely be beneficial given her drug history and tendency
> towards impulsive behavior. She does have the ability to perform both simple and
> more detailed tasks. She does have some distractibility and would have difficulty

[5]A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's
overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). "A GAF of 51-60 indicates '[m]oderate
symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or co-workers).'" Tagger v. Astrue, 536 F.Supp.2d 1170, 1173 n.6
(C.D.Cal. 2008) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34).

doing them on a repetitive basis.

In all likelihood she would be somewhat impaired in accepting instructions from supervisors. Although she notes that she is doing better on the medication in terms of interacting with other people. This will likely remain one of her weaknesses. She would have some difficulties with coworkers and the public for the same reason.

The claimant is eight months pregnant and will soon deliver her baby it is unlikely at this point in time that she will be able to perform any meaningful work even with additional supervision. Following her pregnancy she will in all likelihood need to be reevaluated for her ability to do work. At this point in time given her condition it is really inconceivable that she could maintain regular attendance in the workplace due to her pregnancy.

Furthermore it would be difficult for her to complete a normal workday or workweek both due to a combination of her pregnancy and her current mood state.

Tr. 298-99.

In her decision, the ALJ found in relevant part that:

Regarding the consultative examiner Dr. Reuther's report, . . . [w]hile discussing claimant's bipolar disorder in terms of her pregnancy, and after reporting that her moods were a lot better, he noted that her disorder could be exacerbated following the birth. However, Dr. Reuther also noted that it was "likely that with the resumption with mood stabilizer treatment she will continue to be stable within the next year." (Exhibit 6F/5). I continue to give this opinion significant weight; Dr. Reuther is an acceptable medical source and his opinion is consistent with the treatment records in Exhibits 17F, 23F, and 27F. Further, . . . claimant's main concerns were stressors and there was not an uncontrolled bi-polar condition . . . Thus, there is some consistency between the evidence in the reports but not in the opinions that these sources have stated. Dr. Reuther is entitled to more weight because he is more objective and consistent with the record as a whole.

Tr. 24-25. In addition, the ALJ found Dr. Reuther's opinion to be consistent with the mental residual functional capacity she herself assessed plaintiff with: a limitation "to simple tasks involving minimal interaction with the public, co-employees, and supervisors." Tr. 23.

Plaintiff argues that despite this last statement by the ALJ and the "significant weight" she gave his opinion as a whole, not all of the limitations found by Dr. Reuther were included in the ALJ's assessment of her mental residual functional capacity. Specifically, plaintiff asserts the ALJ failed to also include in that assessment, Dr. Reuther's statement above that she would have difficulty performing simple tasks on a repetitive basis, and that "she would be somewhat impaired in accepting instructions from supervisors" and "would have some difficulties with coworkers and the public." Tr. 298. Defendant agrees the ALJ erred in failing to address at least the first limitation regarding performing simple tasks on a repetitive basis, and the Court finds the ALJ erred with respect to all three stated limitations.

The parties disagree, however, as to the consequences of this error. Plaintiff argues Dr. Reuther's opinion here must be credited as true, which, when so credited, supports a finding that she is incapable of performing even unskilled work – which requires the ability to understand, remember and carry out simple instructions and respond appropriately to supervisor and co-workers – and thus is disabled. See 20 C.F.R. § 416.921; Social Security Ruling ("SSR") 96-9, 1996 WL 374185 *9 (stating substantial loss in ability to meet any of these basic work-related activities would severely limit occupational base). Defendant argues that because the ALJ did not account for "the apparent inconsistency" between Dr. Reuther's opinion that plaintiff had "some distractibility" and his opinion regarding her ability to perform repetitive simple tasks, and because Dr. Reuther "may" have based his assessment of plaintiff's functioning on her own subjective complaints, remand for further consideration thereof is warranted. (Dkt. #15, p. 6).

The Court agrees with plaintiff that this is a *post hoc* rationale for seeking remand, and thus is not a proper basis doing so. See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (error to affirm ALJ's credibility decision based on evidence ALJ did not discuss). That is, nowhere in his decision did the ALJ state or imply these were among the reasons he chose to disregard or not consider any portion of Dr. Reuther's evaluation report. Nor is there necessarily an inconsistency between being distractible and not being able to repetitively perform simple tasks. Indeed, if one has a tendency to be distracted, it is entirely likely such a tendency would result in an impaired ability to do repetitive tasks. Dr. Reuther's report also contains a mental status examination, which – even if his opinion is based to some extent on plaintiff's subjective complaints – itself provides a proper foundation for a medical diagnosis. See Clester v. Apfel, 70 F.Supp.2d 985, 990 (S.D. Iowa 1999) ("The results of a mental status examination provide the basis for a diagnostic impression of a psychiatric disorder, just as the results of a physical examination provide the basis for the diagnosis of a physical illness or injury.").

On the other hand, the ALJ did note Dr. Reuther's statement that "with the resumption with mood stabilizer treatment," plaintiff "likely" would "continue to be stable within the next year." Tr. 25. Thus, it appears Dr. Reuther believed there was a likelihood that in less than a year after resuming proper medical treatment, plaintiff would no longer be limited to the extent he currently found her to be as a result of her mental impairments. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show she suffers from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months). In addition, Dr. Reuther, as

1    noted above, attributed the mental functional limitations he found to a significant extent on her pregnancy,

2    which clearly would result in a different functional assessment post birth.

3         It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a

4    treating or examining physician," that opinion generally is credited "as a matter of law." <u>Lester</u>, 81 F.3d at

5    834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on crediting

6    of evidence, this constitutes an outstanding issue that must be resolved, remand for an outright award of

7    benefits is not warranted.  <u>Bunnell v. Barnhart</u>, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases

8    where the vocational expert has failed to address a claimant's limitations as established by improperly

9    discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings rather than

10   payment of benefits." <u>Bunnell</u>, 336 F.3d at 1116.  Since, as discussed above, it is far from clear whether

11   the ALJ would be required to find plaintiff disabled based on Dr. Reuther's evaluation report, and because

12   the vocational expert did not address the specific limitations he found and which plaintiff asserts

13   demonstrates disability on her part, remand for further consideration of this evidence is more appropriate.

14        B.    Dr. Schneider

15        Another psychological evaluation of plaintiff was conducted by Robert E. Schneider, Ph.D., in

16   mid-May 2005, resulting in the following opinion, which reads in relevant part:

17        Sara presents with a very significant personality disorder. . . .

18        . . . It is possible that . . . medications are controlling the more florid aspects of her
     affective disorder, but her current symptom description suggests that her behavior is
19   more consistent with regressed borderline personality disorder than with bipolar
     disorder.  Regardless of the diagnosis, she is equally out of control and equally unlikely
20   to be able to sustain gainful employment more than a few months at a time.

21        Regarding ability to responsibly parent her children, respond to their needs, provide a
     safe and secure environment and control her own behavior when dealing with them,
22   this evaluation indicates that she has very little self-regulation and very little ability to
     regulate her own behavior when interacting with her children and limited ability to
23   respond to crisis, to anticipate the needs of her children or to monitor their health and
     emotional needs. . . . Her ability to regulate her own emotions, respond appropriately to
24   her children, be responsive to their emotional needs, set limits in a responsible, caring
     manner and control her own reactions when her children are acting out are all a
25   concern.  This evaluation suggests that this individual requires supervision in her
     parenting and careful evaluation regarding her fitness as a mother. . . . Ensuring that
26   there are external controls and external monitoring of her interactions and behavior
     with her younger child is highly recommended.

27
28   Tr. 388-89.  In terms of prognosis, Dr. Schneider felt it to be "[p]oor due to the severity and chronicity of

     her psychiatric condition and her personality disorder." Tr. 389.  With respect to plaintiff's ability to work,

Dr. Schneider further opined in relevant part as follows:

> Sara presents as someone who can follow only very simple instructions and directions. . . . Her ability to adapt to competitive employment in a stable way is considered to be unlikely. She might be able to perform multiple brief jobs, but her ability to sustain a job is considered to be unlikely since it is far more likely than not that she will either lose emotional control or act in some other way that will result in her termination.

Id. Dr. Schneider also assessed her with a GAF score of 42. Id.; see Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep job); Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF score in the forties may be associated with a serious impairment in occupational functioning.").

The ALJ provided the following assessment of Dr. Schneider's opinion:

> I have accepted Dr. Schneider's view that claimant needs supervision regarding parenting; I also give weight to his evaluation of her fitness to be a mother because this appears the primary reason for his report. However, I give little weight to his opinion regarding claimant's ability to work. Dr. Schneider's opinion is not consistent with the medical and reported evidence. At one point, he stated that claimant's "ability to sustain a job is considered unlikely since it is more likely than not that she will either lose emotional control or act in some other way that will result in her termination" (Exhibit 15F/6). However, he also reported that claimant presented as someone who could follow simple instructions and directions (Exhibit 15F/6). Thus, he was ambiguous. In fact, claimant reported she was working at Dairy Queen at the time and had been doing so for two months (Exhibit 15F/1, 2). In addition, claimant opined that the drugs she had been using induced the visual and auditory hallucinations she had experienced and she was now clean (Exhibit 15F/2). Further, claimant's MMPI testing resulted in an invalid profile. Dr. Schneider found that claimant generated a high score on the "fake bad" scale and also presented as being somewhat manipulative and calculating (Exhibit 15F/5). Therefore, I give very little weight to his assessment of claimant's GAF, because it is based on a one-time evaluation and he was not very objective. In addition, I give no weight to his assessment of a personality disorder. Dr. Schneider did not have access to the full medical record and treating sources did not diagnose that.

Tr. 24. Plaintiff argues the ALJ erred in so rejecting Dr. Schneider's opinion regarding her ability to work. Specifically, she asserts the ALJ erred in finding Dr. Schneider's statement that she "could follow simple instructions and directions" to be inconsistent with his statement that it was unlikely she could sustain a job due to either losing "emotional control" or acting "in some other way that will result in her termination." Id. The Court agrees, as there is no evidence that the ability to follow simple instructions and directions is in any way connected to or affected by the ability to maintain emotional control.

On the other hand, the Court disagrees the ALJ erred in discounting Dr. Schneider's opinion on the basis of plaintiff's "invalid profile," her high "fake bad scale" score – which indicates "she was endorsing

1   infrequent, unlikely and unrealistic psychiatric symptoms" – and her "somewhat manipulative and

2   calculating" presentation. Tr. 24, 388. Plaintiff argues the ALJ pointed to nothing indicating Dr. Schneider

3   failed to factor these findings into his opinion. However, a physician's opinion premised on a claimant's

4   subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's

5   credibility, as it does in this case as explained below. See Tonapetyan, 242 F.3d at 1149; Morgan v.

6   Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion of

7   physician premised to large extent on claimant's own accounts of her symptoms and limitations may be

8   disregarded where those complaints have been properly discounted). At the very least, therefore, the ALJ

9   could fault Dr. Schneider for not giving those findings greater emphasis in his conclusions.

10      Plaintiff correctly asserts, though, that the ALJ improperly rejected Dr. Schneider's opinion due to

11  the fact that it was "based on a one-time evaluation" and because Dr. Schneider was "not very objective."

12  Tr. 24. First, just because Dr. Schneider saw and evaluated plaintiff one time does not alone invalidate any

13  findings or opinions of his based thereon, particularly as the Commissioner himself often relies on such

14  one-time evaluations in determining a claimant's disability or lack thereof. Nor is the evaluation report

15  Dr. Schneider issued the kind of conclusory, check-the-box form on which the Ninth Circuit generally

16  frowns. See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized

17  medical opinions over check-off reports). Second, the ALJ fails to state in what manner he found Dr.

18  Schneider's opinion to be "not very objective." Indeed, that opinion is based at least in part on the results

19  of the mental status examination Dr. Schneider performed, which, as discussed above, forms a proper basis

20  for a medical diagnosis. See Murray, 722 F.2d at 501.

21      Accordingly, while the ALJ did provide one valid reason for giving little weight to Dr. Schneider's

22  opinion concerning plaintiff's ability to work, the majority of the reasons the ALJ gave for doing so lacked

23  legitimacy. The ALJ, therefore, erred here. Plaintiff argues that because of this, Dr. Schneider's opinion

24  should be credited as true. But, as with Dr. Reuther's opinion discussed above, it is not clear that the ALJ

25  would be required to find plaintiff disabled, given that the vocational expert did not provide any testimony

26  as to the limitations Dr. Schneider found, and that, again as explained below, the ALJ properly discounted

27  plaintiff's credibility in this case. As such, remand for further proceedings is proper.

28      C.   Dr. Clifford and Dr. Robinson

A state agency psychiatric review technique form was completed by Thomas Clifford, Ph.D., in late April 2004, and affirmed by John Robinson, Ph.D., in early July 2004, who, based on their review of the evidence in the record, found plaintiff had the following diagnoses: bipolar disorder and methamphetamine abuse in early full remission. Tr. 310, 315. Drs. Clifford and Robinson also found she had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. Tr. 317.

A state agency mental residual functional capacity assessment form also was completed by Dr. Clifford in late April 2004, and affirmed by Dr. Robinson in early July 2004, in which they found plaintiff to be moderately limited in her ability to:

- understand, remember and carry out detailed instructions;
- maintain attention and concentration for extended periods;
- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- accept instructions and respond appropriately to criticism from supervisors; and
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

Tr. 301-02. Drs. Clifford and Robinson also found that plaintiff would be "capable of understanding, remembering and carrying out SRT [simple and routine and/or repetitive tasks] and some complex tasks" and interacting with the public, supervisors and co-workers, but that she "would do best in a [small] non-public work setting . . . where expectations" were "known" and she was "not measured by production," that she might "have some difficulty adapting to changes in a competitive work environment" secondary to her symptoms and pregnancy, and that she might "have difficulty accepting instructions from supervisors." Tr. 303-04.

With respect to the findings contained in the above mental residual functional capacity assessment form, the ALJ stated that:

The [administrative law] judge has considered the opinion of the state agency's reviewing doctor that claimant is able to do simple, routine tasks and some complex tasks and would do best in a small workplace where expectations are known and she is

not measured by production (Exhibit 8F). It is unclear what the basis for all these limitations are. The judge has accepted some of them and finds that others are not consistent with the medical evidence and evidence regarding claimant's daily activities. Her ability to do housework, volunteer work, go to school, care for her children without her boy friend's help and other activities indicates a fairly extensive ability. The functional limitations determined appropriate by the [administrative law] judge are consistent with the record as a whole, including Dr. Reuther's report (Exhibit 6F).

Tr. 26. Plaintiff argues these stated reasons for not adopting all of the limitations found by Drs. Clifford and Robinson are not legitimate. The Court agrees.

First, given that Dr. Clifford and Dr. Robinson are non-examining consulting psychologists, it is clear, contrary to the ALJ's statement, that they based the mental functional limitations they found on their review of the evidence in the record, including the evaluation report, and findings and opinions contained therein, completed by Dr. Reuther. See Tr. 301, 303-04. As did Drs. Clifford and Robinson, Dr. Reuther also found plaintiff to be impaired in her ability to interact appropriately with supervisors, co-workers and the general public. Tr. 298. He also found her likely to be incapable of maintaining "regular attendance in the workplace" and completing "a normal workday or workweek." Tr. 298-99. Dr. Schneider too opined as to the substantial impact plaintiff's mental impairments had on her ability to work. See Tr. 389. There is support in the record, therefore, for the determination of Dr. Clifford and Dr. Robinson that plaintiff had significant limitations in at least these several mental functional areas.

In addition, while the evidence concerning plaintiff's activities of daily living noted by the ALJ do, as discussed below, indicate she is not as incapacitated by her mental impairments as she has alleged, no explanation was provided as to how those activities invalidated all of the specific functional limitations found by Drs. Clifford and Robinson that were not adopted by the ALJ. As to the ALJ's statement that the mental functional limitations she assessed plaintiff with – i.e., "simple tasks involving minimal interactions with the public, co-employees, and supervisors" (Tr. 23) – are consistent with the evidence in the record as a whole, as discussed above, it is not at all clear this is so, given the ALJ's errors in evaluating the medical evidence in the record. Accordingly, the Court finds the ALJ erred here as well.

II.    The ALJ's Step Two Findings

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii),

(c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that[her "impairments or their symptoms affect her[his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had the following severe impairments: headaches, a bipolar disorder and a history of drug and alcohol addiction. Tr. 21. Plaintiff argues the ALJ erred in failing to also find her diagnosed personality disorder to be a severe impairment. Also as noted above, the ALJ gave "no weight" to Dr. Schneider's "assessment of a personality disorder," because he "did not have access to the full medical record and treating sources did not diagnose that." Tr. 24. The Court agrees with plaintiff that the first stated reason for rejecting this assessment was improper, given that an examining medical source need not have access to other medical records in order to make a diagnosis. That is, they are qualified to base their diagnosis or assessment on the physical or mental status evaluation they perform. See Clester, 70 F.Supp.2d at 990 (results of mental status examination provide basis for diagnosis of psychiatric disorder, just as results of physical examination do for physical illness or injury).

The Court further finds, as pointed out by plaintiff, that at least two of the medical sources in the record who treated her, diagnosed her with some form of a personality disorder. See Tr. 517 ("Borderline Traits"), 697 ("Personality disorder, not otherwise specified"). Other sources have done so as well. See Tr. 254 ("Personality Dsorder NOS, With Antisocial and Borderline Traits"), 256 ("Borderline Personality D/O"), 430 (""Diagnosis suggestion of Borderline spectrum"). Thus, the ALJ is wrong on both counts here. On the other hand, most medical sources in the record – including Dr. Reuther, Drs. Clifford and Robinson and plaintiff's treating physician, Vu Tinh, M.D., – have not made such a diagnosis. See Tr. 225, 237-38, 243, 274, 298, 301, 303, 310, 315, 321, 325, 327, 376, 383, 397, 423, 437, 460, 564, 566, 570-71, 573, 577, 579, 583, 585, 627, 658-59, 702, 708, 714, 719, 723, 766. As such, it is far from clear that the

1  ALJ erred in not finding plaintiff had a severe personality disorder.  Further consideration of this issue on

2  remand, therefore, is warranted.

3  III.    The ALJ's Assessment of Plaintiff's Credibility

4          Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

5  639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

6  F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

7  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

8  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

9  long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148

10  (9th Cir. 2001).

11          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

12  the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

13  identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.;

14  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

15  malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

16  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v.

17  Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

18          In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

19  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

20  testimony that "appears less than candid."  Smolen, 80 F.3d at 1284.  The ALJ also may consider a

21  claimant's work record and observations of physicians and other third parties regarding the nature, onset,

22  duration, and frequency of symptoms.  Id.

23          In this case, the ALJ found plaintiff's "statements concerning the intensity, persistence and limiting

24  effects of" her symptoms to be not fully credible. Tr. 24.  The substantial evidence in the record supports

25  the ALJ's credibility determination here.  For example, as noted above, the ALJ pointed to Dr. Schneider's

26  observation that on psychological testing, plaintiff produced an "invalid profile," that she "generated a

27  high score on the 'fake bad' scale" and that she "presented as being somewhat manipulative and

28  calculating," as a basis for rejecting his disability opinion. Tr. 24, 388.  This also constitutes a valid reason

for discounting plaintiff's credibility – as it clearly calls into question her veracity – even though the ALJ did not expressly state she was doing so, as such can be reasonably inferred from the fact that she discussed this evidence in the section of her decision dealing with plaintiff's credibility. See Magallanes, 881 F.2d at 755, (court may draw specific and legitimate inferences from ALJ's opinion).

The ALJ also pointed to a mental health assessment of plaintiff completed by Steven Ware, M.S., in early March 2006, which showed inconsistency between her own report of having "no energy," and Mr. Ware's observation that "her presentation was pressured and energetic and her thought process was [rapid and] gregarious in nature." Tr. 24, 396. Inconsistency also was noted by the ALJ in plaintiff's "motives," in that Mr. Ware reported her to be "working . . . to possibly get back into the work force or be determined unable to work so [as] to qualify for Social Security Disability." Id. These too constitute valid bases on which the ALJ could discount plaintiff's credibility. See Smolen, 80 F.3d at 1284 (ALJ may consider prior inconsistent statements, other testimony appearing less than candid and third party observations regarding nature, onset, duration, and frequency of symptoms); see also Tidwell, 161 F.3d at 602 (ALJ may consider motivation and issue of secondary gain in rejecting symptom testimony); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).

The ALJ went on to note that plaintiff's mother reported that plaintiff "lied a lot," which obviously hurts  her credibility." Tr. 25, 129; see also Smolen, 80 F.3d at 1284 (in determining credibility, ALJ may consider ordinary techniques of credibility evaluation such as reputation for lying). The ALJ also pointed to other evidence in the record that plaintiff has been less than truthful:

> . . . [S]he denied using alcohol except for 2 sips in November 2007 but records refer to use in August 2006 (Exhibit 24F/88, 98, 103; 25 F/23). In addition, claimant tested positive for amphetamine in August 2006 (Exhibit 25F/54, 56), but claimed it was due to ingestion of Ritalin. However, Lisa Evans, M.D., while treating claimant for self-harm, referred to possible "stimulant abuse" (Exhibit 24F/104). . . . In June 2007 claimant was seen in the hospital for a Ritalin overdose. Claimant gave two different stories; she stated she was either attempting self-harm or trying to get high (Exhibit 24F/28). This inconsistency hurts her credibility.

Tr. 26. Again, there was no error on the part of the ALJ in discounting plaintiff's credibility in part for these reasons. See Smolen, 80 F.3d at 1284.

In addition, plaintiff's mother stated that plaintiff "expected everyone else to do her work for her," which, as discussed above, also is a valid reason for discounting a claimant's credibility. Tr. 25, 127; see also Matney, 981 F.2d at 1020 (ALJ may consider motivation and issue of secondary gain). The ALJ as

well pointed to evidence in the record of plaintiff's failure to comply with recommended treatment, which once more constitutes a legitimate reason for discounting her credibility. See Tr. 25-26; Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for not seeking or following prescribed course of treatment, or determination that proffered reason is not believable, can cast doubt on claimant's sincerity).

With respect to her failure to comply with treatment, plaintiff, citing to Byrnes v. Shalala, 60 F.3d 639, 641, argues the ALJ failed to make specific findings that if she followed medical recommendations, she would be able to return to work. It is true that in Byrnes the Ninth Circuit held that the ALJ "must 'examine the medical conditions and personal factors that bear on whether [a claimant] can reasonably remedy' his [or her] impairment." Id. (citations omitted). But the Ninth Circuit merely required that the ALJ do so "before basing a denial of benefits on noncompliance" with treatment. Id. (emphasis added). Here, however, the ALJ considered plaintiff's noncompliance merely as one among many reasons in determining her to be less than fully credible, and did not base her ultimate disability decision thereon, at least in the sense meant by the Ninth Circuit in Byrnes.

Plaintiff next argues that in order to deny benefits, her refusal to comply with treatment must have been willful and without justifiable excuse, and posits that any noncompliance on her part could have been due to her mental impairment. Plaintiff relies on court decisions from other circuits for this proposition. Even if the Court were persuaded to follow the holdings of these courts, again while the ALJ did discount plaintiff's credibility in part on her lack of treatment compliance, she did not base her ultimate disability determination on that noncompliance. Thus, the cases plaintiff cites to here, and the legal argument based thereon, are inapplicable here. In addition, even if those cases and that argument were applicable in this case, plaintiff points to and the Court finds no evidence that her mental impairment at all caused her to be noncompliant with recommended treatment.

Lastly, the ALJ discounted plaintiff's credibility in part for the following reasons:

[Plaintiff's mother] also reported that claimant's activities of daily living were quite extensive; claimant was able to cook, care for a cat, take walks, shop, and pay bills. . . .

. . . Claimant's activities of daily living also included going to school (24F/36), caring for her children without her boyfriend's help (23F/27, 54), and camping at the beach (Exhibit 23F/43). . . . Progress notes also show a part-time job (Exhibit 24F/98, 95). . . .

. . . Her ability to do housework, volunteer work, go to school, care for her children

without her boy friend's help and other activities indicates a fairly extensive ability. . . .

Tr. 25-26. To determine whether plaintiff's symptom testimony is credible, the ALJ may consider her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if plaintiff "is able to spend a substantial part of . . . her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. She need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ failed to make any finding that the above activities consumed a substantial part of her day or that they were easily transferable to a work environment. As explained above, though, the Court may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes, 881 F.2d at 755. In discounting plaintiff's credibility in part due to her activities of daily living, it is reasonable to infer therefrom that the ALJ so found with regard to those activities. Indeed, as noted above, the ALJ expressly found the record showed plaintiff's daily activities to be "fairly extensive." In addition, while the evidence in the record concerning the extent and duration of plaintiff's participation in her activities of daily living are somewhat mixed (see Tr. 124-27, 134, 147, 151-55, 296, 384-85, 607, 656-57, 753, 873-74, 895-900, 934-36, 953-59, 965-67), an ALJ's credibility determination may not be reversed where that determination is based on contradictory or ambiguous evidence. See Allen, 749 F.2d at 579.

IV.     The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

In early June 2006, Brent Francisco, A.R.N.P., one of plaintiff's mental health treatment providers, completed a medical source mental assessment form, in which he found plaintiff would "have noticeable difficulty (distracted from job activity and unable to perform) from 11-20% of the workday or workweek (i.e., more than one hour per day or more than one-half day per week" in a number of mental functional

areas, and would have such difficulty "more than 20% of the workday or workweek (i.e., no more than one hour and up to two hours per day or one-half to one day per week)" in several others. Tr. 390-91. In early July 2006, another of plaintiff's mental health treatment providers, Brie Petrie, M.S., completed the same form, in which she found plaintiff would have difficulty in many such areas from 11-20% of the time, and would have difficulty in some others more than 20% of the time. Tr. 560-61. Mr. Francisco completed yet another such form in mid-November 2007, in which he found a similar level of limitation in a number of the same mental functional areas as he did the first time, and plaintiff to be "[n]ot able to perform . . . on [a] regular, reliable and sustained schedule" in regard to several others. Tr. 562-63.

With respect to the findings contained in this forms, the ALJ found as follows:

> . . . In November 2007, Mr. Francisco completed a medical source assessment with limitations much the same as Mr. Petrie assessed previously in July 2006. However, this assessment is given less weight for the same reasons given in the [ALJ's] first opinion (Exhibit 22F; 21F; 3A/8-9). . . .

Tr. 25. In the ALJ's first decision, she made the following relevant findings:

> Due to the reasons discussed below, less weight was given to Medical Source Assessments completed by Brent Francisco, N.P., and Brie Petrie, M.S. Their assessments opine the claimant will have difficulties concentrating and interacting with others for more than 20 percent of the workday and/or workweek. (Exhibits 16F and 20F). However, these findings are not supported by the totality of the medical evidence, including a consultative mental evaluation performed by Dr. Reuther. (Exhibit 6F). It should also be noted that their assessments are inconsistent with their treatment notes. (See Exhibit 17F). Additionally, their reports contain conclusions which are both ambiguous and vague. For instance, they both opine the claimant is able to perform simple tasks and maintain attendance. However, these findings conflict with the above-mentioned limitation regarding the claimant's difficulty concentrating for more than 20 percent of the workday or workweek. These findings, considered together, result in an unclear and incomplete analysis of the claimant's level of functioning. Furthermore, the record reflects Mr. [sic] Petrie has only examined the claimant a few times. Lastly, because neither Nurse Practitioner Fancisco nor Mr. [sic] Petri possesses the medical expertise to render medical conclusions regarding the claimant's level of functioning, greater weight was given to other medical opinions provided by the claimant's treating and evaluating physicians. Neither Mr. Francisco nor Mr. [sic] Petrie is an acceptable source under the Social Security Administration's regulations and they are not entitled to great weight because of that.

> More weight was given to the medical opinions of Dr. [Harold C.] Thurman. (Exhibit 17F). His opinions regarding the claimant's mental functioning are more objective and thorough than the opinions offered by Nurse Practitioner Francisco and Mr. [sic] Petrie. In Addition, Dr. Thurman possesses a greater degree of experience and education, which make him more qualified to provide medical judgments concerning the claimant's functioning.

Tr. 49-50.

Plaintiff argues these reasons for rejecting the findings of Mr. Francisco and Ms. Petrie were not

adequate. The Court agrees. First, the fact that Mr. Francisco and Ms. Petrie are not "acceptable medical source," does not alone mean their findings and opinions are not entitled to great weight. It is true that nurse practitioners and mental health therapists are not "acceptable medical sources" as that term is defined in the Social Security Regulations, and thus their opinions may be given less weight than those of acceptable medical sources. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996); 20 C.F.R. § 404.1513(a), (d), § 416.913(a), (d) (acceptable medical sources include licensed physicians and licensed or certified psychologists). Evidence from "other sources," including that from other "medical sources" such as nurse practitioners, however, may be used to "show the severity" of a claimant's impairments and their effect on the claimant's ability to work. 20 C.F.R. § 404.1513(d), § 416.913(d).

While the Social Security Regulations "provide specific criteria for evaluating medical opinions from 'acceptable medical sources'; . . . they do not explicitly address how to consider relevant opinions and other evidence from" other medical sources listed in 20 C.F.R. § 404.1513(d) and 20 C.F.R. § 416.913(d). Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *3; 20 C.F.R. § 404.1527(a), (d), § 416.927(a), (d).[6] SSR 06-03p was issued on August 9, 2006, however, for the purpose of clarifying how opinions from such other medical sources will be considered:

> . . . With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as

[6]The specific criteria for evaluating the opinions of acceptable medical sources include the following:

• The examining relationship between the individual and the "acceptable medical source";
• The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;
• The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;
• How consistent the medical opinion is with the record as a whole;
• Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and
• Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an "acceptable medical source" has, regardless of the source of that understanding, and the extent to which an "acceptable medical source" is familiar with the other information in the case record, are all relevant factors that we will consider in deciding the weight to give to a medical opinion.

SSR 06-03p, 2006 WL 2329939 *2-*3; 20 C.F.R. § 404.1527(d), § 416.927(d).

impairment severity and functional effects, along with the other relevant evidence in the file. . . .

Although 20 CFR 404.1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's [Social Security Administration's] regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"-both medical sources and "non-medical sources"-can be important in this regard. . . .

As set forth in regulations at 20 CFR 404.1527(b) and 416.927(b), we consider all relevant evidence in the case record when we make a determination or decision about whether the individual is disabled. Evidence includes, but is not limited to, opinion evidence from "acceptable medical sources," medical sources who are not "acceptable medical sources," and "non-medical sources" who have seen the individual in their professional capacity. The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors . . .

Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
  • How long the source has known and how frequently the source has seen the individual;
  • How consistent the opinion is with other evidence;
  • The degree to which the source presents relevant evidence to support an opinion;
  • How well the source explains the opinion;
  • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
  • Any other factors that tend to support or refute the opinion. . . .

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the

opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

SSR 06-03p, 2006 WL 2329939 *3-*5. Thus, an ALJ, after proper analysis, may give more weight to the opinion of an acceptable medical source, but the ALJ may not use the mere fact that the opinion came form an other "medical source" as a reason in itself for discounting that opinion.

It also is true that the ALJ did state he was giving greater weight to the opinions from Dr. Thurman regarding plaintiff's mental functioning, but the ALJ did not state what those opinions were, and, indeed, no such work-related assessment therefrom could be found in the record. The Court also disagrees with the ALJ that the conclusions of Mr. Francisco and Ms. Petrie were ambiguous or vague. Specifically, a finding that plaintiff could perform simple tasks and maintain attendance, does not at all necessarily conflict with a finding that she would have difficulty concentrating for more than 20 percent of the workday or workweek. That is, the ability to maintain concentration over an extended period of time is not the same as being able to perform a particular kind of task or to show up and/or remain at work.

That Ms. Petrie may have examined plaintiff only a few times, furthermore, also is not a valid basis for rejecting the mental functional limitations she found, as an ALJ may – and, indeed, the Commissioner on many occasions does – properly rely on the findings and opinions of an examining medical source who has seen and evaluated a claimant only one time. For that matter, Dr. Thurman, upon whom the ALJ did place great reliance, also appears to have seen and evaluated plaintiff only a few times. The same reason for rejecting Ms. Petrie's findings, would therefore apply to Dr. Thurman's. Lastly, the ALJ does properly note that the treatment records provided by Mr. Francisco and Ms. Petrie provide little objective medical support for the severity of limitations they found. Nevertheless, given that all of the other reasons the ALJ gave for rejecting those limitations were improper, and that, as discussed above, the ALJ failed to properly evaluate the other medical evidence in the record, the Commissioner on remand should re-consider as well the findings made and limitations assessed by these two other "medical sources."

Plaintiff argues those findings and limitations should be credited as true. It is true that where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law. See Schneider

v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding that when lay evidence rejected by ALJ is given effect required by federal regulations, it became clear claimant's limitations were sufficient to meet or equal listed impairment). As noted by the Ninth Circuit, however, courts have "some flexibility" in how they apply the "credit as true" rule. Connett, 340 F.3d at 876. Further, Schneider dealt with the situation where the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976. Such is not the case here, as explained above, and thus the Court declines to apply the credit as true rule.

V.      The ALJ's Step Five Determination

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, as noted above, the ALJ assessed plaintiff with the residual functional capacity to perform light exertional work, with the additional non-exertional limitations that she "should avoid hazards such as heights," and that she was "limited to simple tasks involving minimal interaction with the public, co-employees, and supervisors." Tr. 23. If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's

Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Here, at the second hearing, the ALJ posed a hypothetical question to the vocational expert, which contained substantially the same functional limitations as the ALJ included in the assessment of plaintiff's residual functional capacity. Tr. 971-72. In response to that question, the vocational expert testified that an individual with the same age, education, past relevant work experience and residual functional capacity as plaintiff could perform the jobs of recycler reclaimer (Dictionary of Occupational Titles ("DOT") 929.687-022) and meat clerk (DOT 222.684-010). Id. Based on this testimony, the ALJ found plaintiff capable of performing other jobs existing in significant numbers in the national economy. Tr. 26-27.

Plaintiff argues the ALJ erred in finding her capable of performing these jobs, as the DOT defines them as requiring the ability to perform medium exertional work, whereas she was limited to performing light exertional work. See DOT 929.687-022; DOT 222.684-010. The ALJ may rely on vocational expert testimony that "contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation," and has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ must "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also must explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4. Defendant agrees the ALJ erred in failing to do so

in regard to the above discrepancy, as does the Court.

Plaintiff also argues the vocational expert's testimony conflicts with the requirement set forth in the DOT that both jobs identified above involve Level 2 reasoning, which is defined as follows:

LEVEL 2

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

DOT 929.687-022; DOT 222.684-010; DOT Appendix C. Plaintiff asserts, though, that the limitation to simple tasks found by the ALJ is Level 1 reasoning, which the DOT defines as:

LEVEL 1

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT Appendix C. The undersigned disagrees.

Several courts have found Level 2 reasoning to be consistent with the ability to do simple, routine and/or repetitive work tasks. See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (Level 2 reasoning more consistent with limitation to simple, routine work tasks); Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005) (limitation to simple, repetitive tasks closer to Level 2 reasoning); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51 (D. Minn. 2001) (Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks). It is true that at least one court appears to disagree with the position taken by the above courts. See Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (rejecting contention that claimant limited to following only simple instructions can engage in full range of sedentary work, as many unskilled jobs in that category require reasoning levels of 2 or higher). However, the undersigned finds more persuasive the discussion of this issue again made by the district court in Meissl:

This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for [the claimant's] other work . . . given the ALJ's RFC finding limiting [the claimant] to "simple, repetitive" tasks. The Court finds that it does not.

As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." . . . In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or

ORDER
Page - 24

diagrammatic form" and deal "with problems involving several concrete variables . . . ." . . . The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that [the claimant] could perform . . .

A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables . . . ." . . . Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

[The claimant] focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, [the claimant] seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). . . . To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for [the claimant's] position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that [the claimant] could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that [the claimant's] reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). . . . Someone able to perform simple,

repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir.2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.

*Flaherty v. Halter*, 182 F.Supp.2d 824, 850 (D.Minn.2001).

Meissl, 403 F.Supp.2d at 983-85 (internal citations omitted).

This case is somewhat different than the situation facing the district court in Meissl. As discussed by the district court above, in Meissl the ALJ limited the claimant to simple and repetitive tasks, whereas the ALJ in this case limited plaintiff to simple tasks. At first glance, the ALJ's limitations here would appear to be more consistent with Level 1 reasoning, and its emphasis on "simple" instructions. As the Meissl court noted, however, Level 1 reasoning is "the lowest rung on the development scale," which involves "fairly limited reasoning required to do the job," and is to be applied to "the most elementary of occupations," with "only the slightest bit of rote reasoning being required." Id. at 984. The district court in Meissl, furthermore, noted that the Tenth Circuit had found simple and routine work to be more consistent with a DOT reasoning Level of 2. Although the ALJ did not use the term "routine", the Court finds this to be a distinction without a difference, and thus follows the Tenth Circuit here.

VI.     Remand of this Matter for Further Administrative Proceedings Is Appropriate

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues still remain with respect to the objective medical and lay witness evidence in the record, as well as plaintiff's ability to perform other work existing in significant numbers in the national economy, remand to the Commissioner for further administrative proceedings is appropriate here. In addition, given that this is the second time the ALJ in this matter has had her non-disability decision reversed due to errors contained therein, the Commissioner on remand shall assign the matter to a different ALJ.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not disabled. Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

DATED this 16th day of December, 2009.

Karen L. Strombom
United States Magistrate Judge